898 P.2d 492

Catherine M. BOWMAN, Appellant,

v.

ARIZONA DEPARTMENT OF ECONOMIC SECURITY, an Agency, and Southwest Veterinary Diagnostics, Inc., Appellees.

No. 1 CA–UB 94–0061.

Court of Appeals of Arizona, Division 1, Department B.

May 11, 1995.

Reconsideration Denied June 21, 1995.

Redesignated as Opinion and Publication Ordered June 27, 1995.

544

———

Roger A. McKee, Phoenix, for appellant.

Grant Woods, Atty. Gen. by Robert S. Segelbaum and Daniel Pozefsky, Asst. Attys. Gen., Phoenix, for appellee Arizona Dept. of Economic Sec.

## OPINION

EHRLICH, Judge.

Catherine M. Bowman appeals the decision of the Unemployment Insurance Appeals Board ("Appeals Board") of the Arizona Department of Economic Security ("DES") disqualifying her from receiving unemployment insurance benefits. For the following reasons, we affirm.

### FACTS AND PROCEDURAL HISTORY

Bowman worked in the chemistry department at Southwest Veterinary Diagnostics, Inc., ("SVD") from August 1990 until December 1, 1992. Her subsequent application for unemployment insurance benefits was denied. The DES deputy ruled that she had "voluntarily left work without good cause" [1] because she did not establish the existence of an "intolerable work situation." [2] The Appeal Tribunal affirmed after an evidentiary hearing, basing its decision on Bowman's fail-

---

1. *See* Ariz.Rev.Stat.Annot. ("A.R.S.") section 23–775(1).

2. *See* Ariz.Admin.Code ("A.A.C.") R6–3–50515(C)(1).

ure to demonstrate good cause, her failure to provide evidence to support her claim that she left due to an "intolerable work situation," and her failure to give SVD a reasonable opportunity to investigate and correct the problem. The Appeals Board affirmed and reaffirmed the tribunal's decision. We granted Bowman's timely application for appeal.

Beginning in April 1991, Bowman and her departmental supervisor, Michael Nava, began a consensual intimate relationship that lasted until about August of that year. Bowman testified that the working relationship between her and Nava deteriorated after the break-up. However, she also indicated that the first manifestations of Nava's hostile and retaliatory behavior did not occur until March 1992. She stated that Nava began blaming her for equipment malfunctions caused by other employees as well as the mistakes of fellow workers, refused to train her in new laboratory techniques being taught her colleagues, gave her a more difficult work schedule, berated and ridiculed her in front of others, and asked other employees to watch her.

The friction between Bowman and Nava apparently continued even after Bowman spoke to Robert Van Dyck, SVD's night supervisor, who later transferred Bowman to the radioimmunoassay ("RIA") department. Bowman admitted that, at that time, she did not inform Van Dyck or any other SVD manager of her relationship with Nava; she complained only of his unfair treatment. Shortly after her transfer, and because she was neither professionally satisfied by the RIA work nor able to completely avoid contact with Nava, Bowman decided to lodge a complaint.

On November 10, 1992, Bowman wrote to one of SVD's owners, Marge Westoff, mentioning for the first time the affair between her and Nava, as well as Bowman's belief that Nava's treatment of her was predicated upon her ending the relationship. On the same date, Bowman met with Westoff. The meeting was followed at Westoff's direction by a meeting six days later with Susan Gibson, SVD's laboratory manager. Dissatisfied with the outcome of these meetings, Bowman

tendered her two-week notice the following day and left work on December 1, 1992.

## DISCUSSION

We will affirm the Appeals Board's decision if it is supported by any reasonable interpretation of the record. *Ross v. Arizona Dept. of Economic Security,* 171 Ariz. 128, 129, 829 P.2d 318, 319 (App.1991). Our review is limited to the basis upon which the Board's decision was rendered, *Lane v. Arizona Dept. of Economic Security,* 161 Ariz. 581, 583, 780 P.2d 414, 416 (App.1989), and we are bound by the Board's findings of fact, unless arbitrary, capricious or an abuse of discretion. *E.g., Avila v. Arizona Dept. of Economic Security,* 160 Ariz. 246, 248, 772 P.2d 600, 602 (App.1989). However, this court determines whether the Board properly applied the law to the facts before it. *See Golden Eagle Distrib., Inc. v. Arizona Dept. of Economic Security,* 180 Ariz. 565, 567, 885 P.2d 1130, 1132 (App.1994); *Ross,* 171 Ariz. at 129, 829 P.2d at 319. On this basis, we conclude that the record before the Board supported its denial of unemployment insurance benefits to Bowman.

Although Bowman has characterized her separation from employment as a "constructive discharge" due to sexual harassment, "constructive discharge" is not mentioned in the relevant provisions of Title 6 of the Arizona Administrative Code ("A.A.C."). Recast in Title–6 terms, however, her claim essentially posits that, even though she left work voluntarily, the harassment provided her with good cause. In the appropriate case, we would support such an argument. However, when, as here, a claimant fails to inform an employer of the precise nature of the complaint and thus deprives the employer of a reasonable opportunity to investigate and decide whether corrective measures are needed, the determination that she voluntarily quit without good cause must be affirmed.

In making its determination, the Appeals Board applied the following regulations:

**R6–3–50210. Good cause (V L 210)**
A. The commonly accepted test of "good cause", when considering voluntary leaving, is "What would the reasonable worker

have done under similar circumstances?" The following two points should be considered:

1. What were the claimant's reasons for leaving?

2. Do the reasons justify leaving?

**B.** A worker's voluntary separation is not disqualifying if it is consistent with well defined public policy. Examples of this type of cause for leaving are:

\* \* \* \* \* \*

2. Work which ... involves undue risk to the worker's health or safety.

**C.** A reasonable worker will not quit impulsively. He will attempt to maintain the employment except when this is impossible or impractical. Good cause is generally not established unless the worker takes one or more of the following steps prior to quitting in an attempt to adjust the grievance:

\* \* \* \* \* \*

2. Attempts to adjust unsatisfactory working conditions.

\* \* \* \* \* \*

**D.** A worker need not take such steps before quitting if they are impracticable or impossible, or would obviously not be fruitful.

**R6–3–50515. Working conditions (V L 515)**

**A.** General (V L 515.05)

1. The term "working conditions" includes all aspects of the employer-employee relationship, but in this Section it will be confined to environmental conditions such as light, sanitation, fellow employees, etc.

2. A worker who leaves because of dissatisfaction with working conditions, must show that one or more of these conditions are substantially below those prevailing in the area for similar work.... *The determination generally will turn on a comparison of the claimant's actions with the degree of tolerance the normal worker would be expected to exercise before leav-*

*ing under the same conditions.* [Emphasis added.]

\* \* \* \* \* \*

4. Before good cause or a compelling personal reason for leaving can be established, a worker must have attempted to adjust his grievance prior to leaving unless such an attempt was not feasible.

\* \* \* \* \* \*

**C.** Fellow employee (V L 515.4)

1. A worker who leaves because of inharmonious relations with a fellow employee leaves with good cause if he is [sic] established that the conditions were so unpleasant that remaining at work would create an intolerable work situation for him.

2. In determining whether a situation is intolerable, the following factors should be considered:

a. Would continued employment create a severe nervous strain ...?

b. Was the worker subjected to extreme verbal abuse or profanity? ...

\* \* \* \* \* \*

**F.** Supervisor\* (V L 515.8). When a worker leaves his job for any reason involving his relations with a supervisor, the adjudicator will apply the same considerations that apply to relations with a fellow employee; see R6–3–50515(C).

The Appeals Board found that Bowman did not attempt to adjust her grievances until her meetings with Westoff and Gibson. By quitting the day after the meeting with Gibson, the Appeals Board ruled that Bowman "did not give the Employer sufficient time to investigate the serious charges...." We agree.

On appeal, Bowman claims that the Appeals Board's final ruling ignores facts which she claims are undisputed. We disagree and address each in turn:

(1) Bowman had complained to Van Dyck prior to November 1992 and the result of that complaint was only that Bowman was transferred to the RIA department without any investigation of or action against Nava.

There is nothing in the record to establish that Bowman ever raised the issue of sexual harassment with Van Dyck. Indeed, there is contrary testimony by Bowman herself that she was not inclined to mention the relationship, preferring to cast the problem as one of conflicting personalities. The record supports the Appeals Board's finding that Bowman did not make SVD aware of the sexual harassment until November 10, 1992.

(2) When Bowman did submit her complaint to Westoff, Westoff refused to promise to take any corrective action and ignored the complaint.

Bowman's testimony at the Appeals Tribunal contradicts this assertion. There, Bowman said that she went to see Gibson "because Marge wanted me to go to Susan." Far from ignoring Bowman's complaint, this testimony shows that Westoff believed that the proper course of action was for Bowman to bring her complaint to the attention of Gibson, the person charged with daily management of laboratory and personnel affairs. It was neither inappropriate nor unusual that a business owner would opt to first direct such a serious charge to someone better positioned to investigate and, if necessary, act upon the complaint.

(3) Gibson's response was only to offer Bowman a second transfer and neither investigate nor take any action against Nava.

As noted above, the meeting with Gibson was only the second time that sexual harassment was discussed, the first time being six days earlier with the SVD owner who directed Bowman to discuss the matter with Gibson. Any inadequacy of Gibson's initial response to Bowman's complaint was made moot by the fact that, rather than allow Gibson any opportunity to investigate the matter, Bowman quit the following day. An allegation of managerial inaction, especially concerning such a serious complaint as sexual harassment, cannot be sustained when management is not even provided 24 hours in which to investigate the charge. Bowman's expectation in this regard was unreasonable.

To show "good cause" for leaving employment due to "working conditions," A.A.C. sections R6–3–50210 and R6–3–50515 require the employee to demonstrate that she has taken reasonable steps to preserve the employee-employer relationship and not "quit impulsively" unless this is "impossible or impractical." R6–3–50515(A)(2) suggests that "[t]he determination generally will turn on a comparison of the claimant's actions with the degree of tolerance the normal worker would be expected to exercise before leaving under the same conditions." Comparing Bowman's actions to those expected of an employee, we find that Bowman failed to satisfactorily attempt to adjust her grievance before quitting.

This failure also defeats her claim that an "intolerable work situation" existed, causing "severe nervous strain". As the Appeals Board explained, "[s]ection R6–3–50235(B)(1) requires that a worker who quits because her health is adversely affected by conditions of work must first attempt to correct the working conditions." Bowman did not make SVD aware of the true nature of her problems with Nava until one week before she quit. That she talked to another supervisor and agreed to accept a transfer into another department does not, in this case, satisfy her burden of attempting to "correct" the working conditions. Without knowing the sexual-harassment nature of her complaint, SVD could not be expected to conduct any meaningful investigation of the problem or take appropriate action.

## CONCLUSION

For the foregoing reasons, the determination of the Appeals Board is affirmed.

LANKFORD, P.J., and TOCI, J., concur.